**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

CMM/MJB
F. #2017R00578

*610 Federal Plaza*
*Central Islip, New York 11722*

November 19, 2021

<u>By ECF</u>

The Honorable Joan M. Azrack
United States District Judge
Eastern District of New York
100 Federal Plaza
Central Islip, New York 11722

Re: United States v. Vincent Trimarco
<u>Criminal Docket No. 17-583 (S-1) (JMA)</u>

Dear Judge Azrack:

The government respectfully submits this letter in connection with the sentencing in the above-captioned case. On October 6, 2020, during jury selection, the defendant Vincent Trimarco (the "defendant" or "Trimarco") pled guilty before Your Honor to Count One of a seventeen-count superseding indictment, charging him with conspiracy to commit mail and wire fraud, in violation of 18 U.S.C. § 1349, in connection with a scheme to defraud the minor beneficiary of an estate, in order to steal settlement funds from a federal wrongful death proceeding. As set forth in the Presentence Investigation Report ("PSR"), the defendant's advisory Guidelines range is 57 to 71 months' imprisonment. (<u>See</u> PSR, ¶ 84.)

For the reasons set forth herein, the government respectfully submits that a sentence within the Guidelines range of 46 to 57 months' imprisonment, the range calculated at the time of the plea agreement in this case, is sufficient, but not greater than necessary, to achieve the goals of sentencing in this case. (<u>See</u> Plea Agreement.) To the extent the defendant's request for a "lenient" sentence is one below the stipulated Guidelines range, the government submits that such a sentence is insufficient to account for his crimes and should be rejected. In addition, the government requests restitution and a forfeiture money judgment.

I.  <u>Background and Offense Conduct</u>

The PSR accurately summarizes the offense conduct. (<u>See</u> PSR, ¶¶ 4-14.)

At all relevant times, the defendant was a licensed, practicing attorney, who maintained a law office in Smithtown, New York, which was called The Law Office of Vincent J. Trimarco. (<u>See</u> PSR, ¶ 4.)

A. The Surrogate's Court Proceeding and Federal Wrongful Death Action

In June 2005, Individual #2[1] died while in the custody of the Suffolk County Sheriff's Office. (See PSR, ¶ 5.) Individual #2 died intestate and therefore an estate proceeding was subsequently commenced in Suffolk County Surrogate's Court (the "Surrogate's Court Proceeding") to resolve how the assets of Individual #2 would be distributed. (See PSR, ¶ 6.) In or about May 2007, Individual #1 was named the administrator of Individual #2's estate. As administrator, Individual #1 was responsible for, among other duties, distributing the assets of Individual #2's estate according to the laws of intestacy. (Id.)

A separate wrongful death action was commenced on behalf of Individual #2 in the United States District Court for the Eastern District of New York (the "Federal Wrongful Death Action"). In or about July 2007, the Federal Wrongful Death Action was amended to reflect Individual #1 as the administrator of Individual #2's estate. (See PSR, ¶ 7.) On September 22, 2011, the parties resolved the Federal Wrongful Death Action, as part of which Individual #1 was awarded $3,000,000, as the administrator of Individual #2's estate. As a result of the settlement, in or about October 2011, Individual #1's attorney of record in the Federal Wrongful Death Action and the defendant received $1,000,000 in legal fees and a check for the remaining $2,000,000 was made payable to Individual #1 (the "Settlement Funds"). (Id.) The $2,000,000 check was deposited into an attorney escrow account that the defendant had established on behalf of Individual #1. (Id.)

Until Individual #1's death ▮▮▮▮▮▮▮▮▮▮ in 2017, Individual #1 allowed the defendant unfettered access to the money held in the attorney escrow account (and other bank accounts used to hold the Settlement Funds). (See PSR, ¶¶ 8, 12.) Individual #1 allowed the defendant to make several purchases and investments, both individually and collaboratively with him. (See PSR, ¶ 8.) Notably, the defendant controlled almost every aspect of Individual #1's life, including, but not limited to, controlling the bank accounts holding the Settlement Funds, paying Individual #1's rent and bills, receiving mail on behalf of Individual #1, hiring caretakers for Individual #1, and arranging for drivers to drive Individual #1. (Id.) ▮▮▮▮▮▮▮▮▮▮

In April 2012, a petition was filed with the Suffolk County Surrogate's Court on behalf of Individual #3, a minor, seeking status as the rightful heir and sole distributee in regard to the distribution of funds.[2] (See PSR, ¶ 9.) The Surrogate's Court enjoined Individual

---

[1] Individuals #1, #2 and #3 are described in the Superseding Indictment and identified in the PSR.

[2] As noted by Probation, and as the government agrees, there is insufficient evidence that either the defendant or Individual #1 was aware of Individual #3's existence until after the petition was filed on Individual #3's behalf in April 2012. (See PSR, ¶ 9.)

2

#1 and his agents from removing or reducing the Settlement Funds. On June 5, 2012, a stipulation was signed restraining Individual #1 and his agents from "secreting, dissipating, disposing, encumbering, assigning, removing, pledging or otherwise transferring . . . the proceeds of the wrongful death settlement," including assets previously purchased with the Settlement Funds without further order of the Surrogate's Court. The stipulation was signed by the parties to the case and the Surrogate's Court Judge. (Id.)

On August 8, 2012, the Surrogate's Court determined that Individual #3 was the sole heir and distributee of Individual #2's estate. As such, the Surrogate's Court issued an Order that directed Individual #1 to refund the $2,000,000 in Settlement Funds that was previously distributed to Individual #1 and again enjoined Individual #1 and his agents from, among other things, "accessing, assigning, removing, or otherwise transferring or reducing" the Settlement Funds. (See PSR, ¶ 10.) On August 20, 2012, the Surrogate's Court's August 8, 2012 Order was delivered to the defendant's law office. (Id.) The defendant and Individual #1 ignored the Surrogate's Court's orders and orchestrated a scheme to defraud Individual #3 of the Settlement Funds and the proceeds therefrom.

B. The Scheme to Defraud

The defendant and Individual #1 used the Settlement Funds to purchase and sell various investments, including but not limited to several properties, luxury vehicles and shares in the Emporium, a nightclub in Patchogue, New York, and kept the Settlement Funds and proceeds therefrom from Individual #3, the rightful heir of Individual #2's estate. (See PSR, ¶ 12.) For example, using the Settlement Funds, the defendant and Individual #1 purchased, among other things: a 2007 Ferrari F430 Spider (the "Ferrari") for $200,000; a 2007 Jaguar XKR convertible (the "Jaguar") for $57,000; and three parcels of real property in Suffolk County, New York. In addition, approximately $800,000 of the Settlement Funds was used to invest in the Emporium. (Id.) These "investments" were for the defendant's and Individual #1's self-enrichment and not for the purpose of investing for Individual #2's estate. Indeed, the sale of these "investments" largely benefited the defendant (and not Individual #1) and none of the proceeds were distributed to Individual #3, the rightful heir and sole distributee of Individual #2's estate. (Id.)

The defendant and Individual #1 established various corporations and used previously established businesses in order to purchase and sell these investments, including the Gavin Scott Development Corporation ("GSDC"), a domestic business corporation formed in New York State and based at 1038 W. Jericho Turnpike in Smithtown, New York, which was (and still is) the address of the defendant's law office. (See PSR, ¶¶ 12, 17.) The GSDC was established by the defendant and served no legitimate purpose. In essence, it was a shell corporation that was set up by the defendant to facilitate and conceal transactions made using the Settlement Funds. (See PSR, ¶ 12.)

Despite the Surrogate's Court Orders in April 2012 and August 2012, as well as the June 2012 Stipulation signed by all parties to the Surrogate's Court's Proceeding, enjoining Individual #1 and his agents from removing or reducing the Settlement Funds, the defendant transferred ownership and dissipated the Settlement Funds and proceeds therefrom for his own

3

use. The funds from the sale of the investments purchased with the Settlement Funds were never distributed to Individual #3. (See PSR, ¶¶ 12, 13, 17.)

For example, one of the investments at issue was the Ferrari, which was purchased with the Settlement Funds for $200,000. (See PSR, ¶ 12.) On October 17, 2012, following the Surrogate Court's August 8, 2012 decision, which ordered the refund of the Settlement Funds and enjoined further transfer of the funds, the defendant, through a law firm identified in the Superseding Indictment as the "Montana Law Firm," submitted Articles of Organization to the Montana Secretary of State to incorporate the Gavin Scott Development LLC ("GSDLLC") in the State of Montana. On October 22, 2012, the defendant, through the Montana Law Firm, submitted an application, via interstate postal carrier, for a certificate of title for a Ferrari on behalf of the GSDLCC. Records from the Montana Department of Motor Vehicle Division reflect that the Ferrari was registered to the GSDLLC on October 24, 2012. (Id.) On October 24, 2012, the same day the title was registered in the name of the GSDLLC, the Ferrari was sold back to the auto dealer from which it was originally purchased for $150,000. The $150,000 received from the sale of the Ferrari was transferred from the auto dealer's bank account to the GSDC bank account in New York. (See PSR, ¶ 12.)

In further violation of the Surrogate Court's August 8, 2012 Order, the following withdrawals were made from the GSDC bank account after the Ferrari sale proceeds were deposited into same: (1) on October 24, 2012, $60,000 was transferred to a corporation, which had done business with the defendant; (2) on October 26, 2012, a $1,823.10 point of sale charge was paid to the Montana Law Firm; (3) on November 2, 2012, $15,000 was transferred to a business owned by a relative of the defendant; and (4) on November 14, 2012, $25,000 was transferred to a business in Las Vegas, Nevada to purchase equity securities on behalf of a relative of the defendant. (See PSR, ¶¶ 12, 13.)

The defendant also sold certain assets and investments in contravention of the Surrogate's Court's Orders and fraudulently kept the proceeds of those sales for himself. For example, the defendant and Individual #1 sold the three investment properties: (i) in May 2012, the defendant sold a parcel of real property located in Nesconset for $72,000; (ii) in June 2012, the defendant sold a parcel of real property located in Ronkonkoma for $101,000; and (iii) in October 2012, the defendant sold a parcel of real property located in Hauppauge for $96,000, the defendant's pro rata share. (See PSR, ¶¶ 12, 13.) The defendant received a total of $269,000 from these property sales following the Surrogate's Court's Orders; none of that money was ever provided to Individual #3.

Moreover, the defendant fraudulently converted ownership of shares in the Emporium from Individual #1 to himself. By June 2012, Individual #1 did not have any ownership share in the Emporium, despite having invested over $800,000 in Settlement Funds in the Emporium, whereas the defendant had a majority interest in the Emporium, despite having contributed a nominal amount. (See PSR, ¶ 13.) In June 2012, the shares purchased by others in the Emporium were valued at $25,000 per share. The defendant's ownership interest was 54 shares (according to a June 2012 Shareholders Agreement) and 48 shares (according to a July 2012 Amended Shareholders Agreement), or $1.35 million or $1.2 million,

respectively. None of these shares or ownership interest were ever transferred to Individual #3.

Lastly, automobile repair records from 2012 and 2013 indicate that the Jaguar, another investment purchased with the Settlement Funds for $57,000, was serviced for a variety of issues and registration records indicate that the GSDC registered the Jaguar with the New York State Department of Motor Vehicles through October 2015. (See PSR, ¶ 12.) These repairs and registration occurred after the Surrogate's Court's August 8, 2012 decision, which ordered the return of all Settlement Funds and enjoined further use and transfer of those funds. The defendant and Individual #1 failed to comply with the Surrogate's Court Order and deprived Individual #3 of settlement money proceeds, including the return of the Jaguar.

    C.    The Defendant's Arrest, Indictment and Guilty Plea

On October 27, 2017, the defendant was arraigned on a nineteen-count Indictment returned by a grand jury in the Eastern District of New York. (See ECF #1, 4.) On February 6, 2020, the grand jury returned a seventeen-count Superseding Indictment, charging the defendant with conspiracy to commit mail and wire fraud and various substantive counts in connection with the scheme to defraud Individual #3 of the Settlement Funds. (See ECF #90.) On October 6, 2020, during jury selection, the defendant pled guilty to Count One, charging him with conspiracy to commit mail and wire fraud, in violation of 18 U.S.C. § 1349. (See ECF #133.)

II.    The PSR and Guidelines Calculation

On January 7, 2021, the United States Probation Department issued the PSR; on February 3, 2021 and March 17, 2021, it issued its first and second Addenda, respectively. The PSR set forth the following Guidelines calculation:

| | |
|---|---:|
| Base Offense Level (§ 2B1.1(a)(1)) | 7 |
| Plus: Actual Loss Exceeded $550,000 (§ 2B1.1(b)(1)(H)) | +14 |
| Plus: Sophisticated Means (§ 2B1.1(b)(10)(C)) | +2 |
| Plus: Role Adjustment (§ 3B1.1(c)) | +2 |
| Plus: Abuse of Position of Trust (§ 3B1.3) | +2 |
| Less: Acceptance of Responsibility (§ 3E1.1) | -2 |
| Total Adjusted Offense Level | <u>25</u> |

(See PSR, ¶¶ 24-34). Based on a total offense level of 25 and a Criminal History Category I, the advisory Guidelines range is 57 to 71 months' imprisonment. (See PSR, ¶ 84.) The government does not object to the Guidelines calculation contained in the PSR. Nonetheless,

consistent with the plea agreement between the parties, the government submits that a sentence within the range of 46 to 57 months would be appropriate here.[3]

Although the defendant's sentencing memorandum references the Guidelines calculation stipulated to at the time of the plea agreement, the defendant did not file any objections to Probation's Guidelines calculation. (See Def. Mem. at 2; see also PSR Addenda.)

III. Argument: A Sentence Within the Stipulated Guidelines Range Is Appropriate in This Case

The Court's "starting point and the initial benchmark" when determining the defendant's sentence should be the advisory Guidelines range of imprisonment. Kimbrough v. United States, 552 U.S. 85, 101 (2007). In his sentencing submission, the defendant urges this Court to issue a "lenient" sentence, without proposing what such a sentence should be; presumably, the defendant requests a below-Guidelines sentence. The government submits that a sentence within the stipulated range of 46 to 57 months' imprisonment would be sufficient, but not greater than necessary, to achieve the goals of sentencing in this case. Such a sentence is warranted to address (1) the seriousness of the defendant's conduct, (2) the defendant's disregard for the law, and (3) the need for specific and general deterrence. See 18 U.S.C. §§ 3553(a)(1), (a)(2)(A)-(C).

A. The Seriousness of the Offense

As an initial matter, the nature and seriousness of the offense and the need to provide just punishment warrant a significant sentence. See 18 U.S.C. § 3553(a)(1), (2)(A). As set forth above and in the PSR, the defendant's crimes are serious, particularly since they were perpetrated against an identified minor victim. There is little dispute as to the core elements of the defendant's fraud: the defendant conspired, lied and manipulated others to defraud Individual #3, the rightful beneficiary of an estate, in order to steal settlement funds from a federal wrongful death proceeding. The defendant's motive: pure greed.

The defendant's crime is particularly egregious because he is an attorney. The defendant's violation of his duties as an attorney represents a significant breach of trust vested in him by the courts, the bar and the community at large. As discussed below, this militates in favor of a significant sentence, both to justly punish the defendant and to deter other attorneys from violating the law. See 18 U.S.C. § 3553(a)(2)(A), (B).

What is particularly reprehensible, however, is that the defendant did not merely go along with the crime; he concocted it, enabled it and largely carried it out himself. As the government has maintained throughout the prosecution of this matter, the relationship between the defendant and Individual #1 was initiated by the defendant because he correctly predicted

---

[3] In estimating the applicable Guidelines range in the plea agreement, the government inadvertently failed to include a two-point role adjustment for being an organizer under U.S.S.G. § 3B1.1(c).

that Individual #1 was in line to receive a large settlement that the defendant knew he could steal.

The defendant seemingly pulled Individual #1 into the conspiracy—a person who was vulnerable ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ By all accounts, Individual #1 viewed the defendant as a friend and trusted him; so much so that the defendant controlled every aspect of Individual #1's life. In return, the defendant abused his relationship with Individual #1, led him astray ███████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ Being able to control Individual #1, and by extension the Settlement Funds, the defendant, a licensed attorney fully familiar with the criminal statutes proscribing his behavior, committed crimes to achieve that control. He preyed on Individual #1's vulnerabilities and exploited Individual #1 for his own ends. The exploitation of this relationship, by an officer of the court no less, counsels in favor of a significant sentence.

Indeed, the defendant used his skills as a lawyer not to benefit his client, but to divert millions from Individual #3. He set up bank accounts, and restricted access to and control of the Settlement Funds from anyone but himself. He established various corporations with no legitimate purpose, which he then used as shell corporations to facilitate and conceal transactions made using the Settlement Funds. He engaged the Montana Law Firm to advance fraudulent objectives. And he used the Settlement Funds and the proceeds therefrom to fund a lifestyle of excess, and to pay off his own personal debts.

The harm that the defendant inflicted on Individual #3, who was only 9 years old at the time the defendant's fraud began, was substantial and sustained. As explained by her attorney, Individual #3 "has been deprived of a life where she would have been raised in comfort, security, and relative abundance of the good things in life." (Victim Witness Statement at 5). In seeking justice, including restitution, Individual #3's lawyer states that "[s]uch justice would contain within it, a portion of recompense for all the years of scarcity which [Individual #3] has endured. [Individual #3's] lifestyle is currently quite limited. She also is now raising her own child as a single mother. Surely she is in need of the restoration to her of the stolen funds." (Id. at 7.)

Simply, Trimarco committed a serious offense and, as the Guidelines capture, played a significant role in carrying out the crime, encouraging a vulnerable individual to engage in fraud, and defrauding Individual #3 of her rightful inheritance. A significant term of imprisonment is warranted in these circumstances.

B. <u>Nothing in the Defendant's Background Provides Compelling Mitigation</u>

As noted in the PSR and in the defendant's submission, the defendant has a close-knit family and he has lived a life of advantage and privilege. The circumstances of the defendant's upbringing, family structure, and lack of criminal history, should certainly be considered, but they must also be balanced with the nature and gravity of the instant offense. In fact, the defendant's intelligence, education, and employment as a licensed attorney make his crime all the more inexcusable.

The defendant's crimes were certainly not motivated by need, as made plain by the nature of the purchases he made with the Settlement Funds. Despite operating a successful law practice and otherwise suffering no discernible financial insecurities, the defendant ostensibly used the stolen money to stroke his own ego, buying cars, land and an ownership interest in a nightclub—truly depraved conduct considering that money was rightfully owed to a nine-year old girl who'd recently lost a parent. There is nothing in the defendant's background to explain this depravity; his criminality was motivated by pure greed. That fact alone outweighs any purportedly mitigating circumstances in the defendant's background.

The defendant seeks to minimize, or excuse, his conduct by noting that he has no criminal history and argues that his criminal conduct was aberrant behavior ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (See Def. Mem. at 1, 3-5.) As an initial matter, the defendant's lack of criminal history does not militate against a significant sentence. The applicable Guidelines range already reflects the defendant's limited criminal history, placing him in the lowest possible criminal history category. As such, his lack of criminal history does not merit an additional variance. Moreover, the defendant is an intelligent man who, as accurately reflected in the PSR, executed this scheme through sophisticated means that clearly benefitted from his education and experience as a lawyer. To be sure, the formation of "dummy" corporations, the laundering of money to conceal its fraudulent nature and the fraudulent transfer of properties all were made possible by the defendant's intelligence, cunning and corruption. Moreover, the defendant's conduct was not a momentary aberration or lapse of judgment. As noted, the crime of conviction was sophisticated and extended over the course of five years, some of which was deliberately spent covering up the initial crime. Throughout that period, the defendant actively and repeatedly defied multiple Surrogate Court orders. His criminal conduct was far from a one-time mistake.





█████████████████████████████████████████████
█████████████████████████████████████████████
█████████████████████████████████

██████████████████████████████ Throughout the entire Surrogate's Court Proceeding and the prosecution of this matter, the defendant has attempted to perpetually delay his day of reckoning. And, for the most part, the defendant's tactics have worked to secure successive adjournments of sentencing. ████████████████████████████████
█████████████████████████████████████████████
█████████████████████████████████████████████
████████████████ And throughout the pendency of this matter, the defendant has continued to practice law, try cases, and appear in court on behalf of his clients. He has even appeared as a commentator on several cable news shows. The Court's sentence should reflect the manipulation, lack of candor and unserious manner with which the defendant has approached these proceedings.

C. The Need for Both Specific and General Deterrence is High

The needs for the sentence imposed to promote respect for the law and to afford adequate deterrence to criminal conduct warrant a substantial sentence. See 18 U.S.C. 3553(a)(2)(A), (2)(B).

A sentence within the stipulated Guidelines range is necessary to not only deter the defendant from future crimes, but also to deter similarly situated individuals from engaging in such behavior. As discussed in detail above, motivated entirely by greed, the defendant grossly abused his position of trust in order to defraud a minor beneficiary of her rightful inheritance. The defendant's position as a member of the bar did not deter him from committing a serious criminal offense. Indeed, the defendant is a lawyer who displayed a shocking lack of respect for the law. A severe sentence is necessary to deter the defendant from additional criminal conduct and inflicting further damage on the community at large.

Moreover, the defendant's conduct is particularly insidious insofar as it undermines the public's trust in lawyers. While the circumstances of the defendant's crimes may be unusual, the misuse of client funds by counsel are, unfortunately, not unique. Inasmuch as the defendant engaged in deliberate, premeditated conduct, his case presents a powerful opportunity to send a message of deterrence to those, like the defendant, who would abuse positions of trust to commit bad acts and then use specialized knowledge and training to conceal their crimes. A very substantial sentence is critical, therefore, to send a message to lawyers who may believe that they can cross the line with impunity, seeking to cloak themselves in their law degrees.

IV.     The Court Should Order Restitution and Forfeiture

The Mandatory Victims Restitution Act ("MVRA") provides for mandatory restitution to victims of certain crimes, including conspiracy to commit mail and wire fraud. See 18 U.S.C. § 3663A(c). "The primary and overarching goal of the MVRA is to make victims of crime whole, to fully compensate these victims for their losses and to restore these victims to their original state of well-being." United States v. Quarshi, 634 F.3d 699, 703 (2d Cir. 2011) (internal quotation marks and citation omitted). Consistent with the terms of the plea agreement, the government respectfully requests that the court order the defendant to pay restitution in the amount of $1,500,000.00 to Individual #3.

In addition, in accordance with Rule 32.2, the government previously provided notice to the defendant of its intent to seek forfeiture in the event of his conviction. Fed. R. 32.2(a); ECF Dkt. Nos. 1, 90. In this regard, the applicable statutory provision mandates the forfeiture of all property constituting or derived from proceeds traceable to the crimes of conviction. 18 U.S.C. § 981(a)(1)(C). Moreover, under established Second Circuit precedent, the forfeiture may take the form of a money judgment. See United States v. Awad, 598 F.3d 76, 79 (2d Cir. 2010). Accordingly, the government requests a forfeiture money judgment in the amount of $1,500,000.00. This amount conservatively represents the property and proceeds traceable thereto from which the defendant enriched himself by his criminal acts (including the value of the Ferrari, the property and the ownership interest in the Emporium).

Moreover, the Court may impose both forfeiture and restitution in a criminal case because "the forfeiture and restitution statutes serve different purposes." United States v. Torres, 703 F.3d 194, 203 (2d Cir. 2012). Whereas restitution is intended to compensate victims for the losses caused by the defendant's criminal conduct, forfeiture is intended to interfere with the criminal activity and impose an economic sanction upon the defendant by depriving him of the proceeds and instrumentalities of the crime. Id.

V.  Conclusion

For the reasons set forth herein, the government requests a sentence within the stipulated Guidelines range of 46 to 57 months' imprisonment, together with restitution and a forfeiture money judgment. This sentence is sufficient, but not greater than necessary to achieve the goals of sentencing. See 18 U.S.C. § 3553(a)(2). The government further requests that the defendant be remanded at the time of sentencing.

Respectfully submitted,

BREON PEACE
United States Attorney

By:     /s/
Catherine M. Mirabile
Michael J. Bushwack
Assistant U.S. Attorneys
(631) 715-7850/7878

cc: Jeffrey Lichtman, Esq. (by ECF and email)
Jeffrey Einhorn, Esq. (by ECF and email)
Matin Emouna, Esq. (by ECF and email)
Counsel for Defendant

Gregory Giblin, United States Probation Officer (by email)